### TAYLOR v. THOMPSON et al.

(Supreme Court, Appellate Division, First Department. June 14, 1901.)

1. PARTNERSHIP—FRAUD—AUTHORITY OF PARTNER—FALSE REPRESENTATIONS—LIABILITY OF PARTNER.

   Where the partners of A. authorize him to sell their interest in the partnership, and A. agrees with plaintiff that the latter shall buy the interest of the partners, and that the business shall be continued by A. and the plaintiff, A. is acting as agent of both parties, and damages may be recovered from the partners by the plaintiff for the false representations of A. in procuring the sale, though the other partners did not authorize such false representations, and had no knowledge thereof.

2. SAME—RESCISSION—DAMAGES.

   Where the sale of a mercantile business is effected through false representations, the purchaser cannot retain the goods and business, and sue for money had and received, on the ground of having rescinded the sale, but he can only recover damages for the deceit.

3. SAME—CAVEAT EMPTOR.

   Where a partner states to a purchaser of his interest in the partnership, who is induced to make the purchase on the false representation of another partner, that the seller has no knowledge of the value of the goods and business being sold, the purchaser cannot recover damages, based on false representations of the partner making the sale, in relation thereto, which are unauthorized by the seller.

4. APPEAL—EXCEPTIONS—SUFFICIENCY.

   A statement by the court, on refusing to give a number of charges, that an exception may be entered, and is allowed to each of the requested charges, is a sufficient exception to authorize a review thereof.

Appeal from trial term, New York county.

Action for fraud by William A. Taylor against Robert H. Thompson and another. From a judgment in favor of the plaintiff, and from an order denying a new trial, the defendants appeal. Reversed.

In this action it is attempted to charge the defendants for damages sustained by the plaintiff through misrepresentations alleged to have been made by the firm of Thompson, Culbert & Co., by which misrepresentations the plaintiff was induced to purchase the firm's business. The complaint alleges that an agreement was entered into on October 4, 1889, between Thompson, Culbert & Co. (a firm composed of John Thompson, R. H. Thompson, H. D. Norris, and Robert Culbert) and the plaintiff and the defendant Robert Culbert, whereby the former sold to the latter, in consideration of $26,000 and the payment of outstanding indebtedness, all the assets and property of the

firm; and that the plaintiff paid to the firm $26,000, and, to meet the indebt-edness, the further sum of $51,520.75, upon its representations that the net cost of merchandise on hand was $71,757.19, the collectible bills receivable $43,599.67, and the outstanding loans and notes $51,520.75, and the liabilities for purchases $37,428.96, which representations were untrue. The answer of the defendants R. H. Thompson and H. D. Norris denies that they ever made or authorized any representations as claimed, and alleges that, in ad-dition to the agreement stated in the complaint, an additional agreement was made at the same time, whereby the firm of Thompson, Culbert & Co. was dissolved, and its assets sold to Culbert, who thereupon entered into a partnership with the plaintiff.

Upon the trial the issues were narrowed down to the question of the de-fendants' liability for any representation made by Culbert to the plaintiff, and the nature of the representations made regarding the cost of the stock on hand at the time of the sale, the bills receivable, and the liability existing for purchases of merchandise. The defendants' undisputed testimony is that the three members of the firm of Thompson, Culbert & Co., other than Cul-bert, had contributed the capital, while he was the active manager, and most familiar with its business status; that not long before the sale the firm had suffered a loss of some $30,000, through the defalcation of its clerks, with the result that a dissolution was proposed; that Culbert expressed his desire to retain the business, and set about obtaining the requisite capital; that he consulted his friend Mr. Bonner, who introduced the plaintiff to him, and agreed to loan the money necessary, provided the plaintiff entered upon the venture. The plaintiff testified that he sought Mr. Culbert, who said he was the practical man of the firm, and his partners "were willing to get out of the business if he could get sufficient money"; that they had about $51,000 borrowed money on notes, and if they paid that money, and assumed the outstanding firm's accounts, which he said were $37,000, "we could get the business,—purchase the business"; that Culbert said the bills receivable were about $43,000, and he knew them personally, and they were good as gold; that the cost of the stock was about $71,000, which he had himself figured. Plaintiff testified that he asked Culbert to make up a written state-ment, which he did, and presented to him and Mr. Bonner; that he then had an expert accountant, Mr. Uhler, examine the firm books, and his first re-port was less than Culbert had given, and he made a second report, which was the same as Culbert's. This second report was put in evidence, Cul-bert's report having been lost, and it contains the figures $37,428.96 as owing for purchases, $43,599.67 due for sales of merchandise, and $71,757.19 as the cost of stock. It concludes with the words: "An absolutely accurate state-ment cannot be made from the books in their present condition, but, in my opinion, the above is a conservative one. The probability is that the excess of assets, when determined, will be greater than here shown. J. Clement Uhler." The plaintiff testified that, owing to Mr. Uhler's presenting two different reports, he told Mr. Culbert that he would rely entirely upon what Mr. Culbert assured him and represented was the condition of affairs. Every facility was afforded Mr. Uhler, and the plaintiff had free access to all the firm's books, had he desired to examine them. During the period of exam-ination and negotiation he made no inquiries of any of the defendants except Culbert, although he frequently saw them. Mr. Thompson and Mr. Norris testified that they knew Mr. Culbert wished to continue the business, and had no money, and was endeavoring to get some one to purchase the inter-ests of the other partners, and they heard that Mr. Bonner was to furnish the money, and only a very brief interval before the sale was made did they know that Taylor was to come in as a partner with Culbert. Mr. Bonner's testimony was that Mr. Culbert said "he was afraid the firm was going to be dissolved, and he was going to be left out, unless he could in some way get capital to go in. It was a great thing, as he represented it, provided he could get capital, and go on and continue the business." That he said he knew all the details, and was the only man that could compute the stock, and he was very sure that if he could get a partner he could go on. Upon the plaintiff's approval of the enterprise and assumption of responsibility, Mr. Bonner advanced the necessary money.

The sale was made on October 4th, at which time all the members of Thompson, Culbert & Co., the plaintiff, and the attorneys for both sides, Mr. Curtis and Mr. Monk, were present. According to the defendants, there was but one meeting on October 4th, but the plaintiff asserts that there had been a prior meeting, on October 2d, at which time he was informed that he was to pay $26,000 capital advanced by the members of Thompson, Culbert & Co. other than Culbert, who had put in no capital, as well as pay the sum of $41,520.75 on outstanding notes, and $10,000 due the National Bank of the Republic. Plaintiff finally agreed to pay all that was asked, except interest upon capital, and this claim was withdrawn, and thereupon two agreements were signed,—one the agreement of sale by all parties, and the other the agreement of dissolution by all except the plaintiff, he having not been a member of that firm. Mr. Monk, however, plaintiff's attorney, was a witness to this paper as well as to the other. It was testified that both papers were discussed in the presence of all parties just before the execution. The agreement of sale states that it was "made and entered into at the city of New York by and between John Thompson, Robert B. Culbert, Robert H. Thompson, and Henry D. Norris, as members of the firm of Thompson, Culbert & Co., parties of the first part, and Robert B. Culbert and William A. Taylor, composing the firm of Culbert & Taylor, parties of the second part." It was signed, not only by the members of both firms, but by the firms as well. The agreement of dissolution was made between the four partners, and recites that "whereas, the parties have consented to dissolve said firm, and to sell the assets, good will, and property thereof to Robert B. Culbert: Now, therefore, this indenture witnesseth that the parties hereto mutually agree * * * that the assets," etc., "shall be sold to Robert B. Culbert and William A. Taylor upon condition that said Culbert and Taylor shall pay," etc. Although the agreement of sale refers to the firm of Culbert & Taylor, this latter firm, it seems, was not then formed, the articles being drawn up later, and antedated to October 4th, and notes of the firm being given to Mr. Bonner for the money he had advanced with which the purchase was made, and similarly antedated. These notes took the place of what the plaintiff had previously given Mr. Bonner. Mr. Robert H. Thompson testified that on October 4th, in the midst of the conference, something was said about the condition of the firm, and he said to the plaintiff: "Mr. Taylor, I want you to understand that so far as our side is concerned we know nothing about the value of this business,—the assets or anything else. Our dealing has been with Mr. Culbert. He has gone through the books, and examined the stock, and I presume he knows what he is buying. I want that distinctly understood." On the first trial he testified that he said: "Mr. Taylor, I want you to understand one thing, that I recite here we know nothing whatever about the assets of this concern we have made. Our negotiations have been with Mr. Culbert, and he has gone over this whole affair, and I presume he knows what he is buying. We do not know whether there is $108,000 or $8,000 in the assets of this concern, nor does it make any difference to us. Our agreement is with Mr. Culbert. It is all understood, and we came here to settle it." Mr. John Thompson and Mr. Norris and Mr. Curtis corroborate this testimony. Mr. Taylor and Mr. Monk denied that such words were said. On the other hand, Mr. Taylor asserts, as does Mr. Monk, that something was said at one of these interviews, either by John or Robert Thompson, to the effect that the accounts receivable were as good as gold, and, if desired, would be guarantied for 1 per cent.; that "the business was a good business, and ought to be a very good paying business," and Mr. Taylor was getting more than he was paying. That these statements were made is denied. There is also a contradiction as to what occurred after the sale between the same parties, it being claimed that Mr. Taylor expressed himself as well pleased with the business, and successful, and that he knew all about it from his personal examinations. Mr. Taylor admits that for a long time he said nothing about Mr. Culbert's misrepresentations, but avers that this was because of Mr. Bonner's wishes.

The evidence shows that the purchase account, instead of amounting to $37,428.76, as stated, was $42,449.04, and the books themselves showed that $42,449.04, and not $37,428.76, was due from the firm. And it is undisputed

that the bills receivable, which were supposed to stand for merchandise sold, included the item of $803.43 which was charged up against the clerks who had defaulted. As to the actual cost of the stock in hand, and what Culbert stated was the cost of that stock, there is no dispute but that there was the exact quantity, quality, and kind claimed, and that the exact sums which were used by Culbert as to cartage, freight, etc., in making up the cost as stated by him, do not appear in the books. Mr. Mora, an expert bookkeeper, who had been with Culbert & Taylor, testified that he had figured the net cost in substantially the same manner which Culbert said he did, employing general averages as to freight, etc., used in the trade. His figures were offered in evidence, and received over defendant's objection and exception. He then testified in each instance what he found the actual cost to be, and the difference between his computation and that of Mr. Culbert, and further testified that when he came into the firm of Culbert & Taylor he was shown a cipher word used by them, the word being "Acornelius," of which the successive letters stood for the figures 1,2,3,4,5,6,7,8,9,0. There was then introduced in evidence a paper (Exhibit 24) containing a list of the various liquors, cipher marks beside them, and also figures; and it was testified that the figures were in Mr. Culbert's writing, and that they were not correct translations of the cipher marks. Thus clarets marked "$EN" were quoted at $70, instead of $65, the exact translation of the cipher. In adding Mora's figures and Mr. Culbert's figures, and also the translations of the ciphers, the respective sums are $53,320.68, $71,757.19, and $65,005.43. In the items it appears that most of Mr. Culbert's figures were greater than the cipher, some were the same, and one was less. A Mr. Pardessus testified that he had been bookkeeper for Thompson, Culbert & Co., and he had copied Exhibit 24 for Mr. Culbert, as he did not wish it in his writing, but Mr. Culbert added the code mark and the figures. The jury returned a verdict for the plaintiff in the sum of $16,271.35, and from the judgment thereupon entered, and from order denying motion for a new trial, the defendants Robert H. Thompson and Henry D. Norris appeal.

Argued before HATCH, McLAUGHLIN, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Albert Stickney, for appellants.
Stephen H. Olin, for respondent.

O'BRIEN, J. The questions of whether the representations claimed to have been made by Culbert were those of fact, or mere opinion or calculation, and the extent to which they were relied upon, it is unnecessary to determine, in view of the conclusion at which we have arrived. Proceeding, therefore, to what we think upon this appeal is controlling, we find two phases of the testimony which are to be considered separately, as bearing upon the plaintiff's right to maintain this action against Culbert's co-partners for deceit. It will serve the purpose of clearness if we discuss first that which is later in point of time, but which it is necessary to dispose of before we take up the other, upon which the defendants' liability was, in effect, placed by the charge of the court to the jury. The phase to which we have referred as being subsequent in time concerns what was said and done on or about the 4th of October, 1889, when the parties all assembled at the office of the defendants' attorney for the purpose of completing the purchase and sale. Up to that day there is no claim that any of the defendants other than Culbert had made any express representations, directly or indirectly, or had authorized, assented to, or known of any of Culbert's statements. The negotiations at that time were practically complete, and the

terms of the purchase and sale had been substantially agreed upon. The plaintiff had, through an expert, by him and with the assistance of Culbert, reached a conclusion as to what the new firm was prepared to pay for the business. It is true that upon that day a discussion arose as to whether the plaintiff should pay some capital advanced by some of the defendants, and as to whether interest should be allowed, but these matters were finally adjusted, and were but incidents in the main transaction, which, through the negotiations carried on by Culbert standing as the medium through whom the others acted, had been practically completed, and which the parties were then present to close.

It was testified by Taylor and another witness that on October 4th, or at a previous interview,—there being a dispute as to whether the parties all came together once or twice,—something was said by the defendant John or Robert Thompson to the effect that the accounts receivable were good as gold, and if desired would be guarantied for 1 per cent.; that the business was a good one, and ought to be a paying business; and that Mr. Taylor was getting more than he was paying. The making of these statements is denied, but, in view of the conflict, the question of their having been made was, if they were material, clearly for the jury to determine. We doubt, however, that they were material; for apart from whether, in their nature, they were more than expression of opinion, it was not asserted by the plaintiff that any reliance was placed upon them, the insistence throughout the case being that the specific representations, which it is claimed were false and fraudulent, and upon which he relied entirely, were those made by Culbert in the course of the negotiations. We may therefore dismiss this phase of the testimony with the additional remark that we doubt, if that were all there was of the case, whether a judgment such as was here obtained for a large amount of money for alleged deceit could be supported. If supported at all, it must be upon the other phase of the testimony, namely, that at the beginning, and during the course of the negotiations, Culbert, who must be held to have been the agent of the defendants, made representations which were false, and upon which the plaintiff relied to his damage. It was not proven that the defendants expressly authorized Culbert to make the representations, nor does it appear that they had any knowledge of what he had done in that regard; but it is insisted that, by reason of his relationship as a partner, the other defendants were legally bound by his acts. This presents the most difficult question upon this appeal, which is to define accurately Culbert's relation to the parties,—to both the plaintiff and his former co-partners. As a partner, he was undoubtedly, with respect to all matters within the scope of the partnership, the agent of, and could bind, his co-partners. But how far a partner who, upon a contemplated dissolution of the firm, undertakes to sell its entire business, can be held to be the agent of the other partners, has been a much mooted question. It has been held in this state that "a silent partner, who did not know, nor assume to know, as to the truth of a statement of the condition of the firm made by one of his co-partners to a person

who purchased an interest in the firm on the faith of such statement, was not liable for damages to such person arising from fraud in the statement." Chamberlin v. Prior, 1 Abb. Dec. 338. And it had also been held that one partner has no authority, without the consent of his other partners, to sell and transfer all the partnership property to a third person, not a creditor, and thus practically terminate the partnership. Bender v. Hemstreet, 12 Misc. Rep. 620, 34 N. Y. Supp. 423; Macdonald v. Button-Fastener Co. (Sup.) 9 N. Y. Supp. 383. The principle underlying these cases is that partners are bound by the acts of a co-partner only when such acts are within the scope of the partnership business, and that the agency which exists during the life of the partnership, in what is done to further the business, does not extend to a termination of the partnership; or, in other words, to establish a liability of partners for representations made by a co-partner in selling out the partnership effects, the general rule as to the responsibility of partners does not apply, and, to hold them all liable, a separate agency must be established.

This view has found expression in the reports of other states. Thus, in Summerlot v. Hamilton, 121 Ind. 87, 22 N. E. 973, it was held that:

"Partners are not agents for each other in transactions which relate to the formation or dissolution of the firm, or concerning the disposition of the firm property to each other. The purchase by one partner of the interest of another in the firm property is not a partnership transaction."

And the case of Love v. Payne, 73 Ind. 80, 38 Am. Rep. 111, is thus summarized in the headnote:

"B., a member of a partnership and its business manager, contracted with A. that if he would buy a retiring partner's interest, and pay the balance due upon such partner's share of the capital stock, he should receive a certain interest in the partnership property free from all liens. Afterwards all the partnership property was sold upon a prior mortgage. Suit by A. against the firm for breach of the contract. *Held*, that B. had no authority to make such a contract."

A case more analogous to the one at bar is that of Schwabacker v. Riddle, 84 Ill. 517, in which it was held that:

"Where one partner induces a stranger to purchase the interest of the other partners in a partnership business by fraudulent representations, the parties selling are not liable for such false representations, unless they instigate or approve of them, or the partner making such representations is acting as their agent in making the same. The mere fact of their relation as partners will not make them liable."

And in the opinion the court said:

"The selling of the interest of a partner in the property and business of the firm is very different from conducting or operating the firm business. The sale necessarily works a dissolution of the firm, and what is sold is not what belongs to the firm, but to the individual selling."

Our attention is directed, also, to the decision in Lindmeier v. Monahan, 64 Iowa, 24, 19 N. W. 839, where it appeared that defendants owned a half interest in the business of a firm, one S. owning the other half. Defendants, through the fraudulent representations of S. as to the assets and liabilities of the firm, induced plaintiff to purchase their half interest, paying a certain sum in cash, and

agreeing to pay the firm's indebtedness. The assets being much less, and the liabilities much more, than represented, held, that the defendants were bound by the fraudulent representations made by S. as agent, whether authorized by them or not, "and that plaintiff was entitled to recover what he had lost by reason of the fraud, and to be relieved of all obligation to perform the contract." The court said:

"The mere fact that Studman united in the purchase cannot change the case, if plaintiff was defrauded and injured thereby, and defendants received the benefit from the fraud. Equity will not permit frauds to be effectuated by any such expedients; and, if it should appear that Studman had no authority from the defendants to make the fraudulent representations, the case is the same. It cannot be doubted that, with the knowledge and consent of the defendants, Studman took part in the negotiations leading to the purchase in the course of which the false representations were made. The object of the negotiations was the benefit of the defendants by securing a purchaser. Studman will be regarded as defendants' agent, and they will be responsible for the fraud. This is all of principle there is in the case."

It will be noticed that the two latter cases are seemingly opposed in principle, but, with respect to the facts here presented, we think that both of them are distinguishable. Here it clearly appears that the partners understood that Culbert was endeavoring to get some one to join with him in purchasing the business, and they assented to his doing so, and we think that for the purpose of procuring a joint purchaser, though he was to unite with him in the purchase, Culbert was their agent. But we are also as strong in the view that, having presented to Taylor the subject of the purchase, and the latter having agreed to join with him in it, with the understanding that they were to become co-partners and carry on the business as so purchased, Culbert was equally the agent of Taylor. The legal difficulty presented in reaching a conclusion in this case is due to this dual position which Culbert occupied, acting as he did not alone as one of the principals in buying and selling, but as the agent for both the seller and the purchaser. If we consider Culbert merely in his relation as a principal, then clearly he could not deceive himself, and it is extremely doubtful if legally he could be held to have deceived the plaintiff, who was his co-principal. But we think we must also consider him in his double capacity as agent for each.

This latter dual position demanded of Culbert that he should act in good faith, and be held to fair dealing with respect to both his principals; and, so far as he was guilty of a breach of this duty which he owed to each acting as the agent of the other, a liability to the extent of the injury inflicted arose as against the one who benefited from his fraudulent acts in favor of the other. Applying this principle, we think that the appellants, having authorized Culbert to represent them on the sale, although with the understanding that he was to obtain a third person who was to join him in the purchase, cannot escape liability for his wrongful act upon the theory that it was a wrong done to himself and to another, who was a co-principal. We cannot ignore the fact that he was the agent of the defendants, because to do so would be to eliminate the position occupied by the plaintiff, as an innocent third party fur-

nishing all the money, who was induced to enter upon the negotiations, and to finally consummate the sale, as the result of statements made upon which he relied, by one whom it is conceded represented the defendants.

Upon this branch of the case, therefore, we think that in the matter of the sale of the business Culbert was the agent of his co-partners, and that for his fraudulent representations they are liable, not because of any express authority given to him to make them, but because of the relation which they held to each other and the authority given to sell the business. As already said, Culbert's partners made no representations, and, so far as the negotiations went, they appear to have acted in good faith, having parted with their business. It is a seeming hardship that they should be required to return any part of the consideration. Nevertheless we think that is the necessary result and force of the application of legal principles, provided the plaintiff can establish his right to damages in an action, such as this, for deceit. And in that connection, having elected not to disaffirm the sale, and recover back the consideration, but rather to affirm it, and, while holding the property received and the benefits of the business transferred, to seek damages, he must recover, if at all, not upon the theory of a rescission, as for money had and received, but for damages, after affirmance, upon the theory of deceit, which, as we view it, is the theory upon which the complaint is framed, but to which we briefly allude, because some slight confusion appears to have arisen upon the trial as to the exact nature of this action.

Passing, however, from the liability arising from Culbert's legal relation to the appellants, it is certain in law that it was within their power to limit the extent that he could bind them by notice brought home to the plaintiff. In other words, it was entirely competent for the appellants to serve notice on the plaintiff at any stage of the negotiations, up to the time of the actual sale, that they would not be bound by any statements or representations as to value made by Culbert or anybody else. If the plaintiff, before the sale, had notice from them that he must examine for himself, and be governed by the rule of caveat emptor, then he could not, by afterwards claiming that misrepresentations had been made by Culbert, recover damages for his misstatements. If the testimony of the appellants be accepted, that is just what they did. One of them testified that at the interview, on the day when the sale was consummated, something was said as to the condition of the business, and he said to the plaintiff:

"Mr. Taylor, I want you to understand that, so far as our side is concerned, we know nothing about the value of this business, the assets, or anything else. Our dealing has been with Mr. Culbert. He has gone through the books, and examined the stock, and I presume he knows what he is buying. I want that distinctly understood."

And his testimony on the first trial was that he said:

"Mr. Taylor, I want you to understand one thing, that I recite here we know nothing whatever about the assets of this concern we have made. Our negotiations have been with Mr. Culbert, and he has gone over the whole

affair, and I presume he knows what he is buying. We do not know whether there is $108,000 or $8,000 in the assets of this concern, nor does it make any difference to us. Our agreement is with Mr. Culbert. It is all understood, and we came here to settle it."

After such a statement, the plaintiff, having, as it appears, had full opportunity to examine the books, and make himself personally familiar with the value of the assets, could not close the transaction, and thereafter seek redress for damages sustained, relying on the representations of Culbert; for here, if the testimony is to be credited, was a direct notice, which, in effect, brought home to plaintiff that the other defendants had not authorized Culbert nor any one else to make representations, and that they did not know nor were they concerned with what was the condition of the business or the value of its assets, and that they were treating Culbert, who more than any one else was familiar with the business, as a purchaser, and were dealing with him at arm's length, being willing, regardless of the condition or value of the assets of the firm, to sell at the price to be agreed upon. The benefit of this testimony was entirely lost to the defendants by the refusal of the learned trial judge to charge the request which they made, and which was as follows:

"If you believe that the plaintiff was fully apprised by the defendants that they had no knowledge and took no responsibility as to the value of the interests sold, and that the plaintiff made no objection thereto, then your verdict must be for the defendants. In other words, if you believe that the testimony of Mr. Curtis and the other three witnesses as to the statement made by Robert H. Thompson is substantially correct, then your verdict must be for the defendants."

Having pointed out the importance which, in our view, this testimony had as bearing upon the liability of the defendants, the error committed in refusing to charge the request is of such a substantial character, and so injurious to defendants, as to require the reversal of this judgment and a new trial. It is insisted, however, that the exception to the refusal to charge was not properly taken; and in this connection reliance is placed upon what was said in Henderson v. Bartlett, 32 App. Div. 441, 53 N. Y. Supp. 149, that:

"An exception to a charge requires that the alleged erroneous portions be specifically pointed out, and the exception thereto taken, in order that the appellate tribunal may fairly see what the point sought to be presented is. * * * If the court seeks to give an exception to a party, it must do it in language equally clear, and a mere statement by the court that 'I understand counsel to except to my failure to charge all the requests not charged, and to all modifications of requests,' does not present any question, nor does it relieve a party from pointing out with reasonable certainty the particular wherein the ruling or the charge is excepted to. The court, upon appeal, is practically unable to spell out the point thus sought to be raised."

In the case at bar the defendants presented certain requests in writing, which the court took up, and after stating that it declined to charge the first request, and then disposing of the second, third, and fourth requests, said, on coming to the fifth request: "I will here state—and it will save some little time, perhaps—that to each of the requests of the defendants which I refuse to charge an exception may be entered." And at the end of the case, and after all

the requests on both sides had been passed upon, the counsel for the defendant said to the court, "I understand each of us have an exception to the charges of the requests of the other side?" and the court answered, "Yes." This case, therefore, is clearly distinguishable from the one upon which the respondent relies, because in that case the exception was a general one; whereas here specific requests in writing were presented to the court and read to the jury, some of which were refused, and to which refusal the court itself said that an exception should be noted. There was no doubt, therefore, as to the specific propositions which the defendants sought to have charged, nor their attitude in excepting to the court's refusal to charge specifically, nor is there any doubt of the court's attitude in directing an exception to be noted to the specific proposition presented by the defendants and refused. We think, therefore, that the exception here was properly taken.

It follows that the judgment must be reversed, and a new trial granted, with costs to the appellants to abide the event.

HATCH, J., concurs. McLAUGHLIN and LAUGHLIN, JJ., concur in result.

INGRAHAM, J. I concur with Mr. Justice O'BRIEN that it was error to refuse to charge that the defendants were entitled to a verdict if the plaintiff was fully apprised that the defendants had no knowledge and took no responsibility as to the value of the interest sold. I think, however, that the judgment should also be reversed upon the ground that Culbert was not the agent of his co-partners in this transaction, and that for his fraudulent representations the defendants were not liable. The transaction was a sale by these defendants to their co-partner Culbert. Culbert was the purchaser. The defendants were the sellers, and of this plaintiff had full knowledge. It was none of the defendants' business where Culbert acquired the money to pay for the interest in the business that he purchased. There is no evidence to justify a finding that there was any collusion between the defendants and Culbert, or that Culbert was in fact the agent of the defendants in inducing the plaintiff to invest his money in this firm. On the contrary, it is clear from the whole evidence that all of the parties understood that Culbert was buying the business, and was making the best terms with the defendants that he could to carry out that transaction. The transaction as actually carried out was a sale to Culbert of the defendants' interest in the business, and it is difficult to see how Culbert could be acting as the defendants' agent in the purchase by himself from the defendants of the defendants' interest in the property of the co-partnership. The relations that existed between the parties negatived any implied agency arising from the co-partnership relation, and, in the absence of any proof of an express agency, I do not see how the representations of Culbert, made, not as a member of the firm, but as an individual purchaser, to induce others to join him in making the purchase, can be said to be representations for which those selling to Culbert can be responsible. I concur, therefore, in the reversal of the judgment.